ALEXANDER B. TRUEBLOOD (Cal. Bar No. 150897)
10940 Wilshire Boulevard, Suite 1600
Los Angeles, California 90024
Telephone: (310) 443-4139
Facsimile: (310) 943-2255

ROBERT STEMPLER (Cal. Bar No. 160299)
8200 Wilshire Blvd, Suite 200
Beverly Hills, CA 90211-2331
Telephone (323) 486-0102
Fax: (323) 488-6895

BRANDON A. BLOCK (Cal. Bar No. 215888)
433 North Camden Drive, Suite 600
Beverly Hills, CA 90210
Telephone (310) 887-1440
Facsimile: (310) 496-1420

Attorneys for Plaintiff
JAGDEEP BIDWAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAGDEEP S. BIDWAL,<br><br>Plaintiff,<br><br>vs.<br><br>UNIFUND CCR PARTNERS, UNIFUND PORTFOLIO A, LLC, QUALL CARDOT LLP, MATTHEW W. QUALL, LANG, RICHERT & PATCH, A PROFESSIONAL CORPORATION, ELECTRONIC DOCUMENT PROCESSING, INC., and JULIO ASCORRA,<br><br>Defendants. | Case No: 3:17-CV-2699-LB<br><br>**REPLY BRIEF IN SUPPORT OF MOTION FOR AN AWARD OF ATTORNEYS FEES AND COSTS**<br><br>Date: April 5, 2019<br>Time: 9:30 a.m. |

## I. INTRODUCTION

Plaintiff's attorneys incurred $179,932.50 in time on this case. The opposition leaves the erroneous impression that plaintiff is claiming $359,865 in time, but the larger figure applies only if the court awards a 2.0 multiplier. In fact, plaintiff offered to accept the base $179,932.50 lodestar prior to this motion, but defendants refused. Supp. Trueblood Decl., ¶ 2, Exh. 1. Plaintiff thus had no choice but to litigate this motion, and should now be awarded an additional 15 hours for the reply brief ($10,875). Supp. Trueblood Decl., ¶ 3, Exh. 2.

The defense ignores the many court decisions which have confirmed that plaintiff's counsel's hourly rates are correct. The hourly rates of FDCPA insurance defense counsel are not the relevant legal market, under Ninth Circuit authority, and all of the defense "experts" are in this much lower market.

Nor did plaintiff's lawyers overbill this case. The defense refused to respond to a reasonable settlement offer made in June, 2017. This case settled 15 months later on almost exactly the same terms. It was only the work of plaintiff's lawyers on a difficult case which convinced defendants to change their "no" to "yes." That successful work should now be compensated at the adjusted lodestar figure of $190,807.50, and if the court exercises its discretion, with an additional multiplier for contingent risk and excellent results.

## II. ARGUMENT

A. <u>The Requested Hourly Rates Of Plaintiff's Counsel Are Confirmed By Prior Court Decisions</u>

Defendants have not discussed the real-world court-decisions approving the rates of Mr. Trueblood, Mr. Stempler, and Mr. Block.

Mr. Trueblood was awarded a $700 hourly rate in four separate federal and state court decisions in California from 2013 through 2015. Docket No. 113, ¶ 11. In 2012, the Hon. Saundra Armstrong of this court approved a rate of $675 for Mr. Trueblood, in the case of <u>Baker v. GEMB Lending, Inc.</u>, (USDC N.D. Cal., Case No. CV-10-05261-SBA, Docket No.   ); <u>see also</u> Docket No. 113, ¶ 11. Mr.

1

Trueblood's current rate of $725 is a reasonable increase from the $675 approved by Judge Armstrong seven years ago, and consistent with the four other recent decisions awarding him a $700 rate.

 Eleven years ago, back in 2008, three separate federal district court decisions from California approved Mr. Stempler's rate of $350. Docket No. 112, Stempler Decl., ¶¶ 11-12; Docket No. 112, O'Connor Decl., Exhs. E and F.  A fourth district court approved Mr. Stempler's 2008 hourly rate of $350, and overruled the same defense "expert" (Stephen Turner) now trotted out again by the debt collection industry, in the case of Ambriz v. Arrow Financial Services, (C.D. Cal. Case No. CV 07-5423-JFW, Docket No. 30, May 15, 2008); see Supp. Trueblood Decl., Exhs. 4 and 6. With 11 years of legal fee increases since these past awards, Mr. Stempler's rate is reasonably $600 today. Docket No. 112, O'Connor Decl., ¶ 46.

 As to Mr. Block, in 2016, two judges of the Los Angeles Superior court approved his rate of $525, in the cases of Miranda v. Simple Cash Loans and Rymer v. PRA Receivables Management.  Docket No. 112, Block Decl. ¶ 9.  In 2017, two years ago, Judge Schneider (Ret.) who founded the Los Angeles Superior Court complex litigation department, awarded Mr. Block an hourly rate of $475, after contested fee proceedings, in the case of Tan v. Wheels Financial Group.  Docket No. 112, O'Connor Decl. ¶ 52, Exh. C. Judge Schneider specifically overruled the opinion of the same "expert," June Coleman, now recycled again.  Supp. Trueblood Decl., Exh. 3.  Mr. Block's requested rate of $550 is in keeping with these prior decisions, none of which defendants care to mention in their opposition papers.

 Defendants also ignore plaintiff's evidence of consumer law *defense* bar rates in the Bay Area.  In San Francisco for 2018, the law firm of McGuireWoods LLP charged $690/hour for a lawyer with 13 years of experience, and $475/hour for an associate with five years experience.  O'Connor Decl. ¶ 40, Exh. D.

McGuireWoods is a regular player in the defense market for consumer law cases in California, when there is no insurance available. Supp. Trueblood Decl., ¶ 8.

Finally, the Northern District decisions cited in the opposition actually support plaintiff's counsel's requested hourly rates. The Ninth Circuit has held that a trial court abuses its discretion in determining the prevailing market rate if "it relies on cases decided years before the attorneys actually rendered their services." Camacho v. Bridgeport Financial, 523 F.3d 973, 981 (9th Cir. 2008), citing Bell v. Clackamas County, 341 F.3d 858, 869 (9th Cir. 2003)("holding that it was an abuse of discretion to apply market rates in effect more than two years before the work was performed"). When the older published rates in these cases are updated to today's rates, they confirm that plaintiff's counsel's rates are correct.

For example, defendants cite with approval to Garcia v. Resurgent Capital Services, L.P., in which the Northern District of California found that $400 was a reasonable hourly rate for plaintiff's consumer attorney Ronald Wilcox, in 2012. Opp., p. 17:9. Mr. Wilcox was admitted to the bar in 1995 and his consumer practice is identical to Bidwal's counsel, with whom he has co-counseled. Mr. Wilcox's 2018 hourly rate is $650. Supp. Trueblood Decl., Exh. 7, ¶ 33.

Defendants cite with approval to Martell v. Baker, in which the Northern District of California found that $500 was a reasonable hourly rate for plaintiff's consumer attorney Fred Schwinn, four years ago in 2015. Opp., p. 17:27. Mr. Schwinn's current hourly rate is $650. Schwinn Decl., ¶ 12. Mr. Schwinn was admitted in 2003 and has less experience than all three of Bidwal's counsel.

Defendants also cite with approval to Jiang v. New Millenium Concepts Inc., in which the Northern District of California found that $500 was a reasonable hourly rate for plaintiff's consumer attorney Charles David Marshall in 2016. Mr. Marshall was admitted in 2007, and has six years less experience than Mr. Block. Mr. Block's $550 hourly rate is reasonable in light of the $500 rate awarded to Mr. Marshall three years ago, despite having less experience than Block.

3

B. The Relevant Market Is Not FDCPA Insurance Defense Lawyers

Defendants rely on the declarations of June Coleman, Stephen Turner, Mark Ellis, Tomio Narita, and Stephen Nimoy, who, as they readily admit in their declarations, are not neutral fee "experts," but rather career insurance defense counsel who exclusively represent the members of the American Collector's Association against consumers. Not surprisingly, none of these collection industry lawyers has ever found a consumer attorney's rate reasonable, which is why only lenders and the ACA ever use them as "experts".[1] They are part of the ongoing advocacy by the ACA to unfairly reduce FDCPA plaintiff's lawyers rates, by pretending that the relevant legal market is the FDCPA defense lawyers, a market whose rates are substantially lower due to repeat business and the impact of insurance policies. Time and again, the Ninth Circuit has rejected the comparison.

In Camacho v. Bridgeport Financial, 523 F.3d 973 (9th Cir. 2008), the Ninth Circuit held that hourly rates cannot be determined by the FDCPA defense market:

> Camacho also argues that the district court erred by relying solely on FDCPA cases in determining the prevailing market rate. Camacho is correct that [i]n order to encourage able counsel to undertake FDCPA cases, as Congress intended, it is necessary that counsel be awarded fees commensurate with those which they could obtain by taking *other types of cases*.

Id., 523 F.3d at 978 (emphasis added). The Ninth Circuit has since reiterated this specific holding several times.[2] It has also held that a trial court's de facto policy of "holding the line" at a flat rate for a certain type of case does not constitute an appropriate determination of a "market rate."[3]

---

[1] By contrast, plaintiff's expert John O'Connor has testified for both sides of the aisle.

[2] See Christensen v. Stevedoring Servs. Of Am., 557 F.3d 1049, 1053-1054 (9th Cir 2009); Van Skike v. Dir., OWCP, 557 F.3d 1041, 1047 (9th Cir. 2009).

[3] Christensen, supra, 557 F.3d at 1053-54; Tolentino v. Friedman, 46 F.3d 645, 653 (7th Cir. 1995) ("Paying counsel in FDCPA cases at rates lower than those they can obtain in the marketplace is inconsistent with the congressional desire to enforce the FDCPA through private actions, and therefore misapplies the law.").

4

1  The low hourly rates suggested by defendants, which are even less than
2  plaintiff's counsel's approved rates from ten years ago, are steeply discounted rates
3  for FDCPA defense work, not only lower for being from Sacramento in the case of
4  Coleman and Ellis, but also for the lucrative repeat business that defense firms get
5  from their clients in large portfolios. Supp. O'Connor Decl., ¶ 11. Plaintiff's
6  consumer lawyers must take cases singly on a contingent fee, with no guarantee of
7  payment, and they get no repeat business from large players in the market. The
8  comparison is therefore apples to oranges, according to the caselaw.[4]

9  It must be noted that June Coleman and Mark Ellis are the same attorneys
10 who had their arguments for low hourly defense rates rejected in Camacho. They
11 were defense counsel of record there, are former law partners (Coleman Decl., ¶ 3),
12 and have continued undeterred after their drubbing in Camacho, to make the same
13 unmeritorious arguments.  For example, June Coleman recently argued
14 unsuccessfully that defense bar rates were the relevant market, in an attempt to
15 reduce the rates of Mr. Trueblood and Mr. Block, in Tan v. Wheels Financial.  See
16 Docket 112, O'Connor Decl., Exh. C; Supp. Trueblood Decl., Exh. 3. Similarly,
17 Mark Ellis and Stephen Turner submitted unsuccessful declarations arguing for
18 artificially low defense hourly rates for Mr. Trueblood and Mr. Stempler, in
19 Ambriz v. Arrow Financial Services, (C.D. Cal. Case No. CV 07-5423-JFW). See
20 Supp. Trueblood Decl., Exhs. 4-6.

21 Evidently, the ACA and its hired insurance defense attorneys are going to
22 continue falsely present their low hourly rates as though they were the relevant

---

[4] Norman v. Housing Auth. of Montgomery, 836 F.2d 1292, 1305 (11th Cir. 1988) (insurance defense rates do not reflect similar experience or work outside of insurance defense context); Ibarra v. Barrett, 2008 U.S. Dist. LEXIS 46242, at *6, n. 4 (M.D. Tenn. June 12, 2008) ("As is the custom here and elsewhere, defense attorneys practicing in this field charge lower rates because of the steady volume of work that they can depend upon from the client."); Banker's Sec. Life Ins. Soc. v. Kane, 692 F.Supp. 1326, 1330 (S.D. Fla. 1988) ("if a firm is primarily engaged in insurance defense, billing rates for this kind of work seem almost universally below the average").

5

market, no matter how many times the Ninth Circuit tells them "No." This court should not take the bait.

C.     Defendants' Opinions On Hourly Rates Are Self-Contradictory And Even Disingenuous

The defendants' suggested hourly rates for plaintiff's counsel are truly all over the map. The declarations internally contradict themselves, contradict the other declarations and the published court decisions cited by defendants, and in June Coleman's case, contradicts her own past sworn opinions about these specific attorneys. Predictably, the only consistent theme is that plaintiff's lawyers should be paid less today than their approved hourly rates from a decade ago.

In general, the defense declarations rest on some unsound methodology: (1) the repeated false comparison between different legal markets, rejected in Camacho; (2) a generic blending of all of plaintiff's attorneys suggested rates together into a single suggested range, without any analysis of each separate attorney's appropriate skill, experience, or rate; (3) a refusal to discuss the many past court decisions approving much higher hourly rates for all of plaintiff's counsel; and (4) failure to read the file in this case. The result is a crazy-quilt of final conclusions, ranging from only $260/hour (Tomio Narita, 57% of his own rate in this same case), to $500/hour (Mark Ellis).[5]

Mr. Narita's declaration is puzzling. He admits he charged his own client $450 for his work on this very case. Narita Decl., ¶ 2. This was for 2018, and his 2019 rate would presumably be higher. Yet he goes on to summarily declare that "my clients would insist on paying no more than $260-300/hour" for plaintiff's counsel's time. Why are plaintiff's counsel all worth less per hour for winning the case than Mr. Narita was for losing it?

Mark Ellis contradicts himself, and then Narita. He first states that "I bill my clients no more than $275 per hour for my time in FDCPA matters." Ellis Decl., ¶

6

4. He then declares that his clients *would* pay more than $275 in this case: between $275 to $325 per hour. Ellis Decl., ¶ 5. The reason Ellis' clients would pay more than his supposed $275 maximum rate in this case is not explained. Finally, Ellis concludes, without specifying who he is talking about, that "In my opinion, the reasonable hourly market rate based on the experience of counsel for plaintiff and the legal services provided would be no more than $400 to $500 per hour." Ellis Decl., ¶ 6. He now rebuts his own prior opinion of $275-$300, and Narita's opinion that the rate should be $260-$300. Ellis also fails to disclose that he submitted a similar low-ball declaration in the Ambriz case against Mr. Trueblood and Mr. Stempler, which the court rejected. Supp. Trueblood Decl., Exhs. 5-6.

     June Coleman's declaration is not just mistaken, but fraudulent. In 2016, she submitted a sworn declaration in the Tan v. Wheels Financial case opining that Mr. Trueblood's reasonable 2016 hourly rate was $450, and Mr. Block's was $375. Supp. Trueblood Decl., Exh. 3, ¶¶ 24-25. Yet now, three years later, Coleman declares that both Mr. Trueblood and Mr. Block should be awarded an hourly rate of only $300. Coleman Decl., ¶¶ 4, 10. Coleman does not disclose her prior inconsistent opinion in Tan to this court, nor that this opinion was rejected by Judge Schneider. This at least the *third* time Coleman has submitted misleading sworn testimony to a court. On January 16, 2016, United States District Court Judge James Donato (Northern District of California) criticized Coleman's expert opinions on hourly rates in FDCPA cases as "frivolous" and "based on old and out-of-district cases that hold little relevance to this case," in the matter of Price-Pauline v. Performant Recovery, Inc., Case No. 14-cv-00850-JD. In Martsolf v. JBC Legal Group, P.C., 2008 US Dist. LEXIS 6876 (M.D. Penn. 2008), the United States District Court admonished Coleman, who was defense counsel in that matter, for submitting a misleading declaration, and implied she had violated the Rules of

---

[5] In contrast to the defense, plaintiff's expert John O'Connor has defined the proper relevant market, assessed each attorney's rate separately, and discussed in detail the past court-approved fee awards.

7

Professional Conduct by submitting false testimony to a tribunal. Ms. Coleman also continues to flaunt the <u>Camacho</u> decision, in which she was counsel of record, by insisting that the relevant legal market consists of FDCPA defense counsel. Ms. Coleman should be admonished for her deceit and stricken as an expert.

Finally, declarant Stephen Turner also contradicts himself and the others. He first states that his clients would pay no more than $375 per hour for his or plaintiff's counsel's services. Turner Decl., ¶ 5. But then he declares that he bills $425 in FDCPA cases and that $425 is a reasonable rate to charge for attorneys in these cases. Turner Decl., ¶ 6. Which is correct, $375 per hour or $425 per hour? Whatever figure Mr. Turner actually intended, it contradicts Narita ($260-300), Coleman ($300), and Ellis ($400-500). Turner also fails to disclose that he submitted an expert declaration on hourly rates in the <u>Ambriz</u> matter against Messrs. Trueblood and Stempler, which was rejected by the Central District of California. Supp. Trueblood Decl., Exhs. 4 and 6. Turner knew from <u>Ambriz</u> that Mr. Trueblood was awarded a rate of $495 in 2008, and Mr. Stempler a rate of $350, but did not disclose this to the Court. Supp. Trueblood Decl., Exh. 6.

D.    <u>Defendants' Refusal To Settle Caused The Fees To Which They Now Object</u>

The actual settlement record in this case undermines the assertion that defendants "did everything possible" to settle the case. Narita Decl., ¶ 11. The record shows that defendants: (1) ignored plaintiff's early settlement offer of June 5, 2017, making no counteroffer; (2) sent a January 16, 2018 letter, eight months into the case, demanding that plaintiff *dismiss* the case without payment; (3) refused to send their representatives to the mediation, until ordered by the court, with the process server Ascorra then flaunting that order; (4) refused to respond to plaintiff's April 23, 2018 settlement offer; (5) started a second collection lawsuit against Bidwal in the middle of this case, and served it at the July, 2018 mediation for intimidation; (6) made their first written settlement offer in July, 2018, fourteen months into the case, which included no relief on the state court judgment; and (7)

8

finally settled the case in September, 2018 after capitulating on the state court judgment, and increasing their July, 2018 offer by 40%.

In the end, plaintiff received almost exactly what he had demanded in his June 5, 2017 settlement letter, 15 months earlier. In that letter, he had asked for $24,000 plus attorneys fees and dismissal of the state court case. The final agreement was that Bidwal received $17,000 plus attorneys fees and dismissal of the state court case.

Had defendants counteroffered in June, 2017, this case could have settled, when plaintiff's attorneys fees/costs bills was only $12,233. <u>See</u> Docket No. 113, Exh. 8. But defendants chose "no" instead of "yes." They refused to counteroffer, and heavily litigated the case for another year without making offers until the end.[6]

It was only plaintiff's attorneys hard work over the course of 18 months, including rather extensive written discovery, which finally forced defendants to the table. That discovery included the collection logs, which revealed that Unifund and its attorneys knew plaintiff was telling the truth, but still decided to leverage the void judgment. Plaintiff's attorneys deserve to be compensated for this successful work in overcoming a vigorous defense. Indeed, the defense remains obstinate even today, still arguing that the case is frivolous, after having paid plaintiff $17,000 to settle, and forcing this motion by refusing plaintiff's offer on fees. Supp. Trueblood Decl., ¶ 2, Exh. 1.

E.  <u>The Time Spent On The Case Was Reasonable</u>

**1. The Refusal Of Defense Counsel To Disclose Time Records Is Relevant**

That defense counsel will not disclose their own time records does suggest that plaintiff's lawyers may well have spent less time overall than the defense. These records might have also revealed interesting comparisons on the same categories of work which defendants now claim are duplicative or overbilled such

---

[6] EDP made an offer of $5,000 on December 21, 2017, but that offer included no attorneys fees, and so was a negative net recovery for plaintiff -- not a serious proposal. Docket No. 113, Exh. 9.

9

as attorney conferences and the fee motion. See, e.g., Mendez v. Radec Corp., 818 F. Supp. 2d 667, 668-69 (W.D. N.Y. 2011) ("Where the opposing party challenges the reasonableness of the rate or hours charged by the moving party's counsel, courts are more likely to find that evidence of the nonmoving party's counsel's fees are relevant and discoverable.").

Plaintiff's counsel did not overbill this case. Consumer attorneys, working on a contingent fee, have no incentive to overbill, as noted by the Ninth Circuit:

> It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker.

Moreno v. City of Sacramento, 534 F.3d 1106, 1112 (9th Cir. 2008).

In fact, plaintiff was double-teamed throughout most of this case, with only two lawyers to the defense's four, but still prevailed. This suggests efficiency, not wastefulness. As to complexity, defendants hired Simmonds and Narita, the "complex litigation law firm," to work a case they now say was "simple and straightforward." Sewer service cases like this one always involve dual state and federal litigation, and present difficult issues of intent arising under the "bona fide error" defense of the FDCPA. That is why Unifund opted for Simmonds and Narita, specialists in complex FDCPA litigation, and not some other firm.

### 2. *Defendants' Calculations Of Hours Are Consistently Wrong*

The court simply cannot rely on the hours attributed to various tasks, and the resulting charts, which the defense prepared in this matter. Whoever did that work did not identify which time entries they tabulated to arrive at the totals. There are significant errors, all of which exaggerate the hours billed.

Preparation of Complaints. Mr. Stempler spent 7.8 hours researching and drafting the original complaint, not 9.8 as claimed by defendants,[7] and Mr. Trueblood spent 1.6 hours reviewing and revising Mr. Stempler's work. This was not unreasonable for the detailed, non-boilerplate complaint. Mr. Stempler billed 1.2 hours on the First Amended Complaint, and Mr. Trueblood billed only six minutes, not 2.2 hours.[8] The Second Amended Complaint was a major revision to the case, after extensive review of defendants' document production, not a "cosmetic" change. Mr. Trueblood properly billed 4.8 hours to draft the 2AC. Under FRCP 41, the 2AC could not be filed without leave to amend, and Mr. Trueblood therefore spent 5 hours drafting and filing a motion for leave, which successfully convinced defendants not to oppose upon its filing.

Motion To Strike Defenses. Mr. Stempler billed 5.6 hours to research and draft a motion to strike, not 6.7 hours as claimed.[9] There is no meet and confer requirement in the N.D. California for a motion to strike. Nevertheless, Mr. Stempler emailed a copy of the draft motion to defense counsel on September 11, 2017, and this convinced them to stipulate to amend their answer. Thus, this work was successful in reducing the defenses in the answer from sixteen to only five, saving the court and parties from spending time on boilerplate defenses. Compare Docket Nos. 31 and 41.

Mediation Preparation. Mr. Stempler spent 4.3 hours preparing for mediation, not 7.7.[10] Mr. Trueblood spent 9.3 hours including the mediation brief, not 12.2 hours.[11] Defendants overcount this category by unfairly including all the

---

[7] See Stempler time entries for 3/23/17, 3/25/17, 4/13/17, 5/7/17, and 5/9/17.

[8] See Trueblood time entry for 8/11/17.

[9] See Stempler time entries for 9/8/17, 9/10/17, and 9/11/17.

[10] See Stempler time entries for 4/23/18, 5/31/18, 6/6/18, 6/7/18 (three), 6/8/17 (two), 6/8/17, and 6/13/17 (two).

[11] See Trueblood time entries for 5/2/18, 5/9/18, 5/15/18, 6/6/18, 6/7/18, 6/8/18, and 6/13/18.

11

scheduling and rescheduling of the mediation amongst counsel and mediator, the efforts to get the mediation cutoff extended, and the time successfully opposing the EDP's defendants' frivolous motion to be excused from the mediation.

<u>Deposition Preparation</u>.  Mr. Stempler billed 2.3 hours to prepare plaintiff's two parents and sibling for their noticed depositions, not 10.6 hours.[12] Mr. Trueblood spent .5 hours on deposition preparation, not 2.6 hours.[13] Defendants apparently searched the time records for the words "subpoena" or "deposition" in them, and counted them all as "deposition preparation."  This is disingenuous.

It was defendants who insisted on noticing the depositions of plaintiff's parents and wife, witnesses with little knowledge other than an ability to confirm plaintiff's address history.  Plaintiff's counsel objected that the subpoenas were premature, and violated the court's standing order which barred depositions until all ADR was complete. The third party subpoenas were also repeatedly attempted without adequate notice. <u>See</u> Supp. Trueblood Decl., ¶ 11.

Plaintiff's counsel thus spent time objecting to the subpoenas, briefing the ADR stay issue to the court (Docket Nos 51, 78, 84, 88), contacting the third-party witnesses about the subpoenas, and finally, briefly preparing them for deposition at the end of the case. Defendants have unfairly counted all this time as "deposition preparation." Counsel was merely responding to defendants' insistence on pursuing plaintiff's family members, only minor players in the case, in their effort to make Bidwal tire of the litigation and give up.

<u>Settlement Agreements</u>. Mr. Trueblood spent a total of 4.2 hours drafting the settlements, not 6.7 hours as claimed by defendants. There were two separately negotiated settlement documents in this case, one for the EDP defendants, and one for the Quall/Unifund defendants. Mr. Trueblood spent 1.8 hours drafting and

---

[12] See Stempler time entries for 7/17/18 (two), 9/6/18, and 9/8/18 (two).

[13] See Trueblood time entry for 7/17/18.

12

revising the EDP settlement document,[14] and 2.4 hours drafting and revising the Quall/Unifund document.[15]  Mr. Trueblood was forced to incur another 1.6 hours reminding the Quall/Unifund defendants to provide the next round of revisions, and drafting a status report to the court caused by their delay.[16]

Mr. Stempler spent .9 hours drafting and revising the EDP settlement document,[17] and .6 hours drafting and revising the Quall/Unifund document,[18] for a total of 1.5 hours, not 3.7 hours as claimed by defendants.  He was forced to bill some extra time as well when the EDP defendants bounced their settlement check, and the Unifund/Quall defendants sent theirs to the wrong address.[19]

Initial Disclosures.  Mr. Stempler billed 2.6 hours on plaintiff's initial disclosures, not 4.1 hours.[20]  He billed another 2.1 hours on supplemental disclosures and document production, which is reasonable. Failure to prepare comprehensive disclosures automatically results in evidence being excluded at trial under FRCP 37, and there is an ongoing duty to supplement initial disclosures with new information.

### 3. Counsel Properly Billed For Attorney Conferences

Defendants assert that 31.4 alleged hours of communications between plaintiff's counsel should be disallowed, without identifying the individual time entries they used to calculate this figure. Such communications between counsel actually create an overall economy by avoiding duplication of work.  The courts

---

[14] See Trueblood time entries for 8/20/18, 8/21/18 and 10/19/18.

[15] See Trueblood time entries for 9/19/18, 9/28/18, 10/3/18, 10/16/18, 11/8/18, 11/9/18, and 11/27/18.

[16] See Trueblood time entries for 9/24/18, 11/9/18, 11/14/18, 11/16/18, 11/19/18 (two), 11/20/18, and 11/26/18.

[17] See Stempler time entries for 8/20/18 and 8/21/18.

[18] See Stempler time entries for 9/28/18, 11/9/18, 11/23/18

[19] See Stempler time entries from 12/7/18 through 12/13/18.

[20] See Stempler time entries for 8/10/2017 (two),

13

have thus overwhelmingly endorsed billing for attorney conferences and emails.[21]
And, billing thirty-one hours over a year and half of litigation is not excessive.

### 4. Mr. Block Should Be Compensated For His Time

Defendants had four attorneys to defend this case, yet argue that adding a third attorney on the plaintiff's side was unreasonable.  Mr. Block only associated in after the July, 2018 mediation had failed, and negotiations were at a standstill.  Plaintiff was facing a fact discovery cutoff of November 20, 2018, only a few months away, and needed the extra help to complete discovery.  Mr. Block was an experienced addition to plaintiff's team, a necessary asset both for completing discovery and assisting in trial preparation.  The fact that the case settled a few months after Mr. Block associated in, is not any fault of his, and attests to the positive impact he had.

### 5. Counsel's Time Entries Are Not "Block Billed" Or Vague

Counsel did not "block bill" their time, which is defined as entering "the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." Welch v. Metro. Life Ins. Co., 480 F.3d 942, 945 n.2 (9th Cir. 2007).  Counsel's timesheets consistently show multiple entries for different tasks

---

[21] See, e.g., Charlebois v. Angels Baseball LP, 993 F. Supp. 2d 1109, 1125 (C.D. Cal. 2012) ("the Court declines to reduce the hours simply because Class Counsel kept each other informed about the case and double-checked each other's work"); Oklahoma Natural Gas Co. v. Apache Corp., 355 F.Supp.2d 1246, 1262–63 (N.D. Okla. 2004) ("Obviously, lawyers working together on a case must communicate with each other and that communication may spare the client duplication of effort"); Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County, 278 F.Supp.2d 1301, 1316 (M.D. Fla. 2003) (quoting Natl. Assn. of Concerned Veterans v. Sec. of Defense, 675 F.2d 1319, 1337 (D.C. Cir. 1982) ("Time spent in attorney conferences is generally compensable for each participant" since it is necessary for the attorneys to "spend at least some of their time conferring with colleagues, particularly their subordinates, to ensure that a case in managed in an effective as well as efficient manner."); In re Frontier Airlines, 74 B.R. 973, 977–78 (Bankr.D.Colo.1987) (where multiple attorneys perform interrelated functions that require "some degree of coordination and communication among them, ... intraoffice conferences among counsel are not only expected but are necessary, and there is no reason why compensation should not be provided for such services"); McKenzie v. Kennickell, 645 F.Supp. 437, 450 (D.D.C. 1986) (awarding attorneys' fees for co-counsel conferences); Williamsburg Fair Hous. Comm. v. Ross–Rodney Hous. Corp., 599 F.Supp. 509, 518 (S.D.N.Y. 1984) ("Multiple attorneys may be essential for planning strategy, eliciting testimony or evaluating facts or law.").

on the same day, not a single block entry each day.  Moreover, the notion of "block billing" is irrelevant to this case. "Block billing" is an issue only if there is a need to separate out work that qualifies for compensation from work that does not. Jaramillo v. County of Orange, 200 Cal.App.4th 811, 830 (2011); see also K.M. v. Tustin Unified Sch. Dist., 78 F.Supp.3d 1289, 1304 (C.D. Cal., 2015) (("[T]he Court does not find a discount for block billing in this situation appropriate, where, as here, the entries support that the time expended was related to the matters on which Plaintiff seeks fees.")(emphasis added).

Nor are counsel's time entries vague.  The chart of supposedly "vague" entries presented by the defense actually shows quite detailed time entries describing the specific tasks completed.  Narita Decl., Exhs. C-D.

### 6. Solo Practitioners Cannot Delegate To Associates Or Paralegals

All three of plaintiff's counsel are solo practitioners without associates or paralegals. Supp. Trueblood Decl., ¶ 10. The law is well-established that courts should not reduce hourly rates or time based merely on an attorney's status as a solo practitioner.[22]

Dated:  March 18, 2019          Respectfully Submitted,

TRUEBLOOD LAW FIRM


By:   /s/
      Alexander B. Trueblood
      Attorneys for Plaintiff

---

[22] Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC, 497 F.3d 133, 143 n. 6 (2d Cir. 2007)("it is long established that courts should not automatically reduce the reasonable hourly rate based solely on an attorney's status as a solo practitioner"); McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 98 n.6 (2d Cir. N.Y. 2006)("it would be error to use an attorney's status as a solo practitioner as an automatic deduction or shortcut for determining the reasonable hourly rate"); Hutchison v. Amateur Elec. Supply Inc., 42 F.3d 1037, 1048 (7th Cir. 1994) ("plaintiff asserts that her counsel was essentially a sole practitioner with only part-time associates and law clerks during much of this litigation. If true, the district court's reduction for what it saw as top-heavy staffing cannot be sustained"); Goins v. JBC & Assocs., P.C., 2006 U.S. Dist. LEXIS 8717 (D. Conn. Mar. 6, 2006)("inasmuch as Attorney Faulkner is a solo practitioner without such staff, and they are tasks appropriately performed by an attorney, the rate for these tasks will not be reduced.").

15