ALEXANDER B. TRUEBLOOD (Cal. Bar No. 150897)
10940 Wilshire Boulevard, Suite 1600
Los Angeles, California 90024
Telephone: (310) 443-4139
Facsimile: (310) 943-2255

ROBERT STEMPLER (Cal. Bar No. 160299)
8200 Wilshire Blvd, Suite 200
Beverly Hills, CA 90211-2331
Telephone (323) 486-0102
Fax: (323) 488-6895

BRANDON A. BLOCK (Cal. Bar No. 215888)
433 North Camden Drive, Suite 600
Beverly Hills, CA 90210
Telephone (310) 887-1440
Facsimile: (310) 496-1420

Attorneys for Plaintiff
JAGDEEP BIDWAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAGDEEP S. BIDWAL,<br><br>Plaintiff,<br><br>vs.<br><br>UNIFUND CCR PARTNERS, UNIFUND PORTFOLIO A, LLC, QUALL CARDOT LLP, MATTHEW W. QUALL, LANG, RICHERT & PATCH, A PROFESSIONAL CORPORATION, ELECTRONIC DOCUMENT PROCESSING, INC., and JULIO ASCORRA,<br><br>Defendants. | Case No: 3:17-CV-2699-LB<br><br>**DECLARATION OF JOHN D. O'CONNOR IN REPLY TO THE OPPOSITION OF DEFENDANTS TO MOTION FOR ATTORNEYS FEES AND COSTS** |

REPLY DECLARATION OF JOHN D. O'CONNOR

1

## DECLARATION OF JOHN D. O'CONNOR

I, John D. O'Connor, declare as follows:

1. Let me first address the two cases in which Courts in the Northern District of California have stricken limited portions of my Declarations. Both cases were unusual fee petitions in hotly contested litigation likely to be appealed.

2. In my opinion as a litigator, the Court was wise in each case to strike the portions with which it disagreed in order to protect its record after having rejected my particular opinion.

3. Although the Courts in *Cuviello* and *Nosal* did not agree with certain of my opinions, the decision by each Court quite strongly supports the acceptance of Mr. Trueblood's requested rate here.

4. The *Cuviello* decision sanctioned the hiring by the Defendants of the esteemed law firm Fulbright and Jaworski, even though the Defendants were also represented by a competent insurance defense firm, the Murphy Pearson firm. I did not disagree that the fees of the Fulbright firm of $725 and $695 per hour for partners were market rates in 2015, and, indeed, opined that these were rates consistent with the market for firms of stature. This 2015 decision, now four years old, would today justify fees of $850 and $800 per hour for the same partners.

5. The "speculation" as found by the Court was that the defense firm apparently hired by the insurance carrier, Murphy Pearson, was charging insurance defense rates, since it was defending under an insurance policy. Moreover, I knew that firm's normal insurance defense rates were $250 per partner hour. However, the firm did not disclose to the Court its actual charges. Instead, the partner averred that her "customary" rate was $500 per hour. Yet, the Court noted that "it is not clear whether those rates were paid in this case." (*See* **Exhibit A**.) That was precisely my point, and I had opined that the Defendant should not receive more in attorneys fees than the amounts actually paid to the Murphy Pearson firm.

6. So, although the Court wisely protected its record by calling my opinion speculation, it would still be my position that I was opining to what was reasonable inference.

7. The *Nosal* Court allowed the high hourly rates of O'Melveny and Myers ("OMM") for all tasks and rejected my suggestion that the petitioning party for at least part of its legal services should be recompensed at lower rates.

8. *Nosal* was a criminal prosecution in which a departing executive from Korn Ferry International ("KFI") had allegedly converted valuable trade secret customer lists. OMM had assisted the U.S. Attorney's Office on behalf of KFI and sought approximately $964,000 in fees, a large portion at the rates in excess of $800 and $900 per hour.

9. As in the case of Fulbright and Jaworski, I opined that these were prevailing market rates. I did opine that some of the more mundane services could have been supplied by OMM associating with competent CJA lawyers charging $250 per hour. The Court rejected this opinion.

10. Therefore, although the defense in this case attempts to discredit my opinions as to petitioning counsel's rates, each of the two opinions strongly support high hourly rates, when those rates are prevailing rates in the community, even if some of the services were in fact mundane. These cases, in short, appear to militate against the argument of the defense that because this case was claimedly "simple", the prevailing market rates should not apply.

11. In this case, the only lawyers who opined in favor of rates sought by the defense were all themselves defense counsel charging institutional rates, lower than those charged in the market for "one-off" financial litigation, low rates charged in exchange for a steady flow of referrals. Indeed, these rates appear to be insurance defense rates which represent only a small segment of the market. The claim that such insurance defense rates should apply to the prevailing party were soundly rejected in the *Camacho* case previously cited.

12. While at the Tarkington firm, I represented a wide range of institutional clients in a wide range of debt collection cases, generally charging institutional rates which were lower than the market rates. Our firm charged these lower rates as institutional counsel in exchange for a steady flow of referrals. Our clients bargained down these rates precisely so that they could pay less than the market rates otherwise prevailing.

13. In the foregoing capacity, I represented a number of banks, savings and loans, and credit unions, many of which had failed or were failing, and our bills were often paid by the FDIC, FSLIC, RTC and the NCUA. My firm also directly represented the United States in the collection of student loans from individuals.

14. I have also provided services directly for a number of banks, including Wells Fargo bank and Silicon Valley Bank, and for a number of years was a member of the Commercial Law League of America, a professional group that specializes in representing creditors. In short, I have ample experience, including twenty-one years of experience collecting debts for financial institutions, in financial litigation.

15. The cases cited by Defendant in its opposition brief support the prevailing view that institutional defense rates are not generally held by Courts to apply to the plaintiffs in FDCPA actions.

16. For example, the defense cites the *Price-Pauline* case at page 18 of its opposition brief, in which a twenty-eight-year lawyer, Mr. Boriston, was awarded $600 per hour in 2016, which is the equivalent of approximately $700-$725 in 2019 for a skilled, experienced twenty-eight-year lawyer such as Mr. Trueblood.

17. In addition to these cases cited by the defense which support the rates here sought, the defense appears to ignore other cases in which Courts have awarded comparable amounts to Mr. Trueblood. The defense also submits Declarations inconsistent with prior Declarations by those same counsel. For example, in *Tan v. Wheels Financial Group, Inc.*, cited in Plaintiff's motion, Ms. Coleman opined that Mr. Trueblood's 2016 note should have been $450 per hour, whereas she now opines that it should be $300 per hour three years later in 2019. In *Tan*, she declared under penalty of perjury that Mr. Brandon Block's 2016 rate should be $375, yet now opines it should be $300 three years later.

18. Also, Ms. Coleman does not mention that Judge Schneider rejected her opinion and awarded rates of $675 and $475 for these two lawyers three years ago.

19. All of the Declarations and briefs indeed ignore Court orders from past years, cited by Plaintiff, approving rates up to $700 per hour in earlier years.

REPLY DECLARATION OF JOHN D. O'CONNOR

4

20. The defense also makes an asserted distinction as to hourly rates between "contingent" and "non-contingent" rates. But the case law and normal practice does not. In fact, in contingent cases where the prevailing plaintiff has a right to fees, the goal is to award hourly rates in contingent cases based upon those normally charged in non-contingent cases by lawyers of similar skill, reputation and experience.

21. The "contingent" factor only comes into play when considering a multiplier. That the case is contingent, and as defense counsel argues, in this instance difficult for Plaintiff to win, is actually a factor in favor of some level of multiplier.

22. Counsel opining for the defense, especially Mr. Narita, failed to explain why the defense chose to settle only after a significant amount of litigation. If the defense case was as strong as Mr. Narita stated, then the defense should have continued on the course upon which it originally set out. Of course, it would be wise and rational for the defense to settle the case if there developed a significant chance that the Plaintiff might prevail.

23. If this case was settled solely for the purpose of avoiding litigation costs, the defense could have decided to settle at the very outset of the litigation. But it chose not to do so, likely because it anticipated clear success.

24. The procedural posture suggests that this was a hard-fought case in which Plaintiff's counsel was pursuing the case skillfully and performing better than originally anticipated by the defense.

25. Notably absent from the record put forth by the defense is the amount of hours expended by defense counsel. It is difficult to believe that the defense hours would be significantly lower than those expended by the Plaintiff and, if they were, I would expect, as I have seen in cases where there is significant discrepancy in hours as between the parties, the defense to disclose its total hours.

26. The figures for particular tasks which the defense cites as shocking do not strike me as a practitioner of forty-seven years' experience as being abnormal in the least.

REPLY DECLARATION OF JOHN D. O'CONNOR

5

27. Eleven hours for a Complaint, and twenty hours for two lawyers to prepare for and attend mediation do not appear excessive, and the defense does not inform us as to why these seemingly pedestrian amounts are excessive.

28. The defense does criticize the three petitioning lawyers for not employing junior associates and paralegals to work on the case at a lower hourly figure, without showing that such personnel were available. However, there has been no showing that such delegation would have saved litigation expense. Additionally, the law cited by petitioning counsel is clear that "solo" lawyers should not be punished for not working for a large firm.

29. Moreover, as one who has seen a varied number of large legal bills both as a litigator and as an expert, I can aver that without strong discipline, task delegation to lower- rate junior counsel and paralegals often increases legal expense for the two-fold reason that junior lawyers are often more inefficient in their work than experienced counsel, and that such lower-level work often requires some level of duplication by the senior lawyer in order to use the product of the junior lawyer. To my observation, most lawyers do not efficiently draft briefs until they reach the senior associate or junior partner level of experience.

30. As the defense has pointed out, two Courts in the Northern District have rejected my contention that in highly specific situations, work could have been performed by a lawyer with a lower billing rate. In *Cuviello*, I opined that certain tasks could have been performed by insurance defense counsel, Murphy Pearson. In *Nosal*, I opined that certain tasks of OMM could have been performed by lower-rate CJA lawyers. Even though my opinions were highly nuanced as to the work that could have been referred to partner-level lawyers billing at lower rates, each Court rejected my opinion, and upheld hourly billing rates far higher than those sought here by Mr. Trueblood and other Plaintiff counsel several years after those opinions. So while attempting to discredit my competence as an expert, the defense has in fact discredited its own contentions and opinions.

31. It is noteworthy that defense has not tied together, as it should, its claim that *Bidwal* is a "simple" case with an analysis as to how that claimed simplicity should translate into lower hours for the task billing criticized.

32. The hours billed for the various tasks do not seem facially excessive, but, rather, to the contrary, appear facially reasonable. But because the defense does not analyze what was and what was not needed and what would be a reasonable range of hours for each particular task, there is no foundation to the assertions that any of these claimedly excessive hours were in fact unreasonable.

33. In summary, 1) cases cited by the defense awarding FDCPA fees are consistent with those cited by the petitioning counsel, and support the rates requested; and 2) there has been no meaningful analysis of the claimedly excessive expenditure of hours by Plaintiff counsel.

34. Finally, Mr. Narita's staunch and persistent claim that this was a defensible case, combined with many months of defense litigation, shows that this case involved considerable risk to Plaintiff's counsel, that victory for the Plaintiff was not a foregone conclusion, and that this was a case without clear liability from the outset, and therefore risky to Plaintiff counsel.

35. In my view, the entirety of the defense opposition strongly supports some level of multiplier for Plaintiff counsel.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on March 18, 2019 at San Francisco, California.

_____
John D. O'Connor

# Exhibit A

Excerpt from *Cuviello v. Feld Entm't, Inc.*,
2015 U.S. Dist. LEXIS 4155, *4-7 (N.D. Cal. Jan. 12, 2015)

II.  REASONABLE HOURLY RATES

The Court has broad discretion in setting the reasonable hourly rates used in the lodestar calculation. *See Syers Properties III, Inc. v. Rankin*, 226 Cal. App. 4th 691, 702-03 (2014). In determining the prevailing rates in the community for similar work, the Court may find it most appropriate to use the actual rates charged or, alternatively, it may determine that application of the *Laffey* Matrix is warranted. *See id.* In the present case, the Feld Defendants request application of the actual rates charged by their attorneys while the Attorney Defendants request application of the *Laffey* Matrix.

The Feld Defendants were represented by three attorneys at the law firm of Fulbright & Jaworski LLP, who customarily charge the following hourly rates: Peter Mason, partner, $725; Todd Sorrell, partner, $695; and Tarifa Laddon, senior associate, $455. Sorrell Decl. ¶ 4 and Ex. A., ECF 53-2. The customary rates actually were paid for the work done in this case. *Id* ¶ 4. Mr. Sorrell states that, based upon his experience, those are reasonable rates for attorneys in California of comparable skill and experience. *Id.* ¶ 4. All three attorneys have submitted resumes reflecting significant relevant litigation experience, expertise and honors. *Id.* ¶ 7 and Exh. B. John O'Connor, an attorneys' fees expert retained by Plaintiff, acknowledges that "Fulbright & Jaworski is an excellent firm, generally of such high reputation that it can charge premium rates." O'Connor Decl. ¶ 38, ECF 63. Mr. O'Connor also opines that the rates charged by Fulbright & Jaworski "are in fact in line with other premium rates charged in the community by those few select firms able to charge them." *Id.* ¶ 39. Plaintiff argues, and Mr. O'Connor opines, that the Feld Defendants could have hired a less expensive firm to represent them. However, "[p]arties normally have the right to counsel of their choice, so long as the counsel satisfy required bar admissions." *Cole v. United States Dist. Court*, 366 F.3d 813, 817 (9th Cir. 2004). Feld retained attorneys that have represented it for a number of years and currently represent it in other litigation. *Id.* ¶ 7. Plaintiff has cited no authority suggesting a constraint on Feld's right to counsel of its choice in this case. The Court notes that, as discussed below, it

has taken every care to ensure that Plaintiff is required to pay only those attorneys' fees reasonably incurred by Defendants.

The Attorney Defendants were represented by two attorneys at the law firm Murphy, Pearson, Bradley & Feeney, who customarily charge the following hourly rates: Janet Everson, partner, $500; and Jennifer Karpinski, associate, $325. It is not clear whether those rates actually were paid in this case. The Attorney Defendants do not seek their counsel's customary hourly rates but rather rates calculated under the *Laffey* Matrix. Application of the *Laffey* Matrix would result in a $50 reduction of Ms. Everson's billing rate to $450 and a $25 increase in Ms. Karpinski's billing rate to $350.

Murphy, Pearson specializes in the practice areas of professional liability defense and legal malpractice litigation. Everson Decl. ¶ 2, ECF 49; Karpinski Decl. ¶ 2, ECF 50. The firm has been recognized by The Recorder, a local legal newspaper, as the preeminent Bay Area firm in those practice areas. *Id.* Both Ms. Everson and Ms. Karpinski have significant relevant experience and, in particular, experience litigating under section 425.16. *Id.* Mr. O'Connor states that Murphy, Pearson is a well-known legal malpractice firm. O'Connor Decl. ¶ 33, ECF 63. Having considered this record and the relatively minor differences between counsel's customary billing rates and the proposed *Laffey* rates, the Court concludes that application of the customary billing rates is appropriate as to the Attorney Defendants' motion as well as that of the Feld Defendants. The Court is satisfied that rates customarily charged by Ms. Everson and Ms. Karpinski are consistent with prevailing rates in the community for similar work. The Court declines to credit Mr. O'Connor's suggested rate of $250 rate as pure speculation lacking factual basis.